UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| FEDERAL TRADE COMMISSION and the STATE OF WISCONSIN, | **Case No. 3:23-cv-737** |
| Plaintiffs, | |
| vs. | |
| RHINELANDER AUTO CENTER, INC., a Wisconsin corporation, also d/b/a Rhinelander GM Auto Center, Rhinelander Cadillac, and OK Used Cars of Rhinelander; | **COMPLAINT FOR MONETARY RELIEF, PERMANENT INJUNCTION, AND OTHER RELIEF** |
| RHINELANDER MOTOR COMPANY, a Wisconsin corporation, also d/b/a Rhinelander Toyota; | |
| RHINELANDER AUTO GROUP LLC, a Wisconsin limited liability company, also d/b/a Rhinelander GM Auto Center, Rhinelander Cadillac, and OK Used Cars of Rhinelander; | |
| RHINELANDER IMPORT GROUP LLC, a Wisconsin limited liability company, also d/b/a Rhinelander Toyota; and | |
| DANIEL TOWNE, individually and as an officer, member, or manager of RHINELANDER AUTO CENTER, INC., RHINELANDER MOTOR COMPANY, RHINELANDER AUTO GROUP LLC and RHINELANDER IMPORT GROUP LLC, | |
| Defendants. | |

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of Wisconsin, for their Complaint allege:

1.      The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, which authorize the FTC to seek, and the Court to order, preliminary and

permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the ECOA and its implementing Regulation B, 12 C.F.R. pt. 202.

2.      The State of Wisconsin brings this action under Wis. Stat. §§ 100.18(11)(d), 100.26(4), 426.109, and 426.301 to obtain temporary and/or permanent injunctive relief, civil forfeitures, consumer restitution, and additional forms of relief, for violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18, and the Wisconsin Consumer Act, Wis. Stat. §§ 421.101–427.105.

## SUMMARY OF CASE

3.      Buying a car is one of the largest purchases an American consumer makes. Finding the right vehicle often involves exhaustive research, multiple dealership visits, and a lot of unfamiliar paperwork.  What already can be a fraught purchasing process becomes all the more difficult when dealerships engage in unlawful deception, unfair practices, and discrimination.  From at least 2016 to the present, Defendant Daniel Towne has directed and controlled the operations of a group of auto dealerships in Rhinelander, Wisconsin, that have been owned and operated at various times by the four Corporate Defendants.  Under Towne's leadership, in the course of promoting, advertising, marketing, selling, leasing, or financing motor vehicles, Defendants have charged a large percentage of their customers for additional products and services ("add-ons" or "add-on products") without those customers' authorization or by leading the customers to believe the add-ons were mandatory.  According to a survey of Defendants' customers, about half were charged for add-on products without their authorization or as a result of deception, which has resulted in hundreds or thousands of dollars in unlawful charges on top of an already expensive vehicle purchase.

2

4.      During that same period, under Towne's leadership, Defendants have further enhanced their bottom line by engaging in unlawful discrimination against American Indian customers who, as a result of such discrimination, have paid hundreds of dollars more in financing charges than non-Latino White customers.  Defendants have had a discretionary policy or practice that permits their employees to mark up interest rates quoted by the third-party financing companies without alerting customers about the markup.  For vehicle purchases financed by companies that allow discretionary markups, Defendants have exercised their discretion to mark up American Indian customers' interest rates an average of approximately 34 basis points[1] more than that of similarly situated non-Latino White customers.  Since March 2019, moreover, the disparity is even higher, with American Indian customers' interest rates marked up on average about 50 basis points more than that of similarly situated non-Latino White customers.  These discretionary markups have cost American Indian customers an average of approximately $401 in additional interest payments over the life of their contracts.

5.      Under Towne's leadership, Defendants also have generated significant profit by more frequently tacking on add-on products when American Indian customers purchase vehicles compared to non-Latino White customers.  Defendants' discriminatory policy or practice of more frequently imposing (or "packing") add-on charges on American Indian customers without obtaining express, informed consent has resulted in American Indian customers paying on average approximately $1,362 more in credit transactions than similarly situated non-Latino White customers.  Since March 2019, moreover, American Indian customers have paid on average approximately $1,374 more than similarly situated non-Latino White customers.

---

[1] A basis point is equal to one hundredth of one percentage point, or 0.01%.

## JURISDICTION & VENUE

6.     This Court has subject matter jurisdiction over claims asserted by the United

States pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1)–(3), (c)(1)–(2), and

(d), and 15 U.S.C. § 53(b).

8.     This Court has supplemental jurisdiction over the State of Wisconsin's claims

pursuant to 28 U.S.C. § 1367(a).

## PLAINTIFFS

9.     The FTC is an independent agency of the United States Government created by

statute.  *See* 15 U.S.C. §§ 41–58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C.

§ 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC

also enforces the ECOA, 15 U.S.C. §§ 1691–1691f, and its implementing Regulation B,

12 C.F.R. pt. 202, which prohibit discrimination on the basis of race, color, and national origin

(among other characteristics) in credit transactions.

10.     The Wisconsin Attorney General and Wisconsin Department of Justice are

authorized to bring this action in the name of Plaintiff State of Wisconsin pursuant to Wis. Stat.

§§ 100.18(11)(d), 426.109, and 426.301.

## DEFENDANTS

### Individual Defendant Daniel Towne

11.     Defendant Daniel Towne is a Wisconsin citizen who has been the general

manager of Defendants' dealerships since 2016, including through two different sets of corporate

owners.  Towne also currently holds a minority ownership stake in the dealerships.

Continuously since 2016, Towne has overseen the dealerships' day-to-day operations.  He

currently is listed as the Owner and Executive Manager on Defendants' websites.  At all times relevant to this Complaint, acting alone or in concert with others, Defendant Towne has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.  Towne resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District.  Since 2016, Towne has had the authority to sign documents on behalf of Defendants' dealerships and hire, fire, and supervise staff, including upper management.  During that time, he has controlled or had the authority to control Defendants' dealerships' sales and financing practices, including those set forth in this Complaint.

## Corporate Defendants

12.     Rhinelander Auto Center, Inc., also doing business as Rhinelander GM Auto Center, Rhinelander Cadillac, and OK Used Cars of Rhinelander, is a Wisconsin corporation with its principal place of business at 1935 North Stevens Street, Rhinelander, Wisconsin 54501-8556.  Rhinelander Auto Center, Inc. has transacted business in this District.  From 2016 until on or about March 25, 2019, acting alone or in concert with others, Rhinelander Auto Center, Inc. advertised, marketed, distributed, or offered vehicles to consumers for sale, and regularly arranged for the extension of credit.

13.     Rhinelander Motor Company, also doing business as Rhinelander Toyota, is a Wisconsin corporation, with its principal place of business at 1935 North Stevens Street, Rhinelander, Wisconsin 54501-8556.  Rhinelander Motor Company has transacted business in this District.  From 2016 until on or about March 25, 2019, acting alone or in concert with others, Rhinelander Motor Company advertised, marketed, distributed, or offered vehicles to consumers for sale, and regularly arranged for the extension of credit.

14.     Rhinelander Auto Group LLC, also doing business as Rhinelander GM Auto Center, Rhinelander Cadillac, and OK Used Cars of Rhinelander, is a Wisconsin limited liability company with its principal place of business at 1935 North Stevens Street, Rhinelander, Wisconsin 54501-8556.  Rhinelander Auto Group LLC transacts or has transacted business in this District.  Since on or about March 25, 2019, acting alone or in concert with others, Rhinelander Auto Group LLC has advertised, marketed, distributed, or offered vehicles to consumers for sale, and has regularly arranged for the extension of credit.

15.     Rhinelander Import Group LLC, also doing business as Rhinelander Toyota, is a Wisconsin limited liability company with its principal place of business at 1955 North Stevens Street, Rhinelander, Wisconsin 54501-8556.  Rhinelander Import Group LLC transacts or has transacted business in this District.  Since on or about March 25, 2019, acting alone or in concert with others, Rhinelander Import Group LLC has advertised, marketed, distributed, or offered vehicles to consumers for sale, and has regularly arranged for the extension of credit.

## Common Enterprises

16.     From 2016 until on or about March 25, 2019, Defendants Rhinelander Auto Center, Inc. and Rhinelander Motor Company ("the Prior Corporate Owners") operated a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law alleged below.  During that period, the Prior Corporate Owners conducted the business practices described below through interrelated companies that had common ownership, officers, managers, sales staff, business functions, and office locations; had shared inventory; and which together held themselves out as a family of dealerships under the name Rhinelander Auto Center.  Because the Prior Corporate Owners operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

6

17.     On or around March 25, 2019, the Prior Corporate Owners sold the dealerships to The Rydell Company, a North Dakota corporation, which transferred its ownership interest in the dealerships to Defendants Rhinelander Auto Group LLC and Rhinelander Import Group LLC ("the Current Corporate Owners").

18.     From on or about March 25, 2019 through the present, the Current Corporate Owners have operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below.  During that period, the Current Corporate Owners have conducted the business practices described below through interrelated companies, which have common ownership, officers, managers, sales staff, business functions, and office locations; which have shared inventory and commingled assets; and which together hold themselves out as a family of dealerships under the name Rhinelander Auto Center.  Because the Current Corporate Owners have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below.

## COMMERCE

19.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

### *Background*

20.     Defendants were or are the owners and operators of three automobile dealerships located in Rhinelander, Wisconsin, that have operated in tandem as the "Rhinelander Auto Center," including Rhinelander GM, Rhinelander Toyota, and OK Used Cars of Rhinelander (collectively, "Rhinelander Auto Dealerships").  Rhinelander GM has operated from 1935 North

Stevens Street, Rhinelander, Wisconsin 54501-8556; Rhinelander Toyota has operated from
1955 North Stevens Street, Rhinelander, Wisconsin 54501-8556; and OK Used Cars of
Rhinelander has operated from 1508 North Stevens Street, Rhinelander, Wisconsin 54501-2227.

21.     Although the ownership of the dealerships changed in or around March 2019,
Defendant Towne has directed and controlled the dealerships' business practices and overseen
their day-to-day operations continuously since 2016.  Furthermore, Defendants' business
practices, including the acts and practices alleged in this Complaint, have remained consistent
from 2016 to present.

22.     At all times material to the Complaint, the Rhinelander Auto Dealerships have
operated under the same name and retained the same physical location, tangible and intangible
assets, managers and employees (including Defendant Towne), business services, and customers.

23.     The Rhinelander Auto Dealerships are all located within one mile of each other.

24.     Rhinelander is in a rural area where there are relatively few nearby automobile
dealerships, and consumers must sometimes drive hours to visit the Rhinelander Auto
Dealerships.

25.     According to recent data from the U.S. Census Bureau, American Indians are the
largest minority group in the City of Rhinelander.  Additionally, several federally recognized
American Indian tribes have homelands within relatively short driving distance from
Rhinelander.  Due to the concentration of tribal communities in the area, many American Indian
consumers purchase cars at the Rhinelander Auto Dealerships.

26.     At the Rhinelander Auto Dealerships, consumers frequently have spent significant
time testing and selecting a vehicle, but deciding on a car has often been only the beginning of a
lengthy process.  Once they select a vehicle and negotiate a price, consumers who are financing

vehicles have had to spend a considerable amount of time filling out application paperwork and waiting for the financing terms to be finalized.  Then, after consumers have already spent hours at the dealership, Defendants have presented consumers with a stack of complex, highly technical documents and, in some instances, mentioned add-on products and services for the very first time.  In doing so, however, Defendants often have provided incomplete, inaccurate, or otherwise misleading information about the add-ons, before rushing consumers through the final steps of the process, which typically have involved dozens of pages of paperwork and multiple items to initial or sign.

27.     A large portion of the profit that Defendants have enjoyed from each transaction has come from the financing of vehicle purchases and charging for add-on products and services.  As a result, maximizing interest-rate markups and add-on charges has been important to Defendants' bottom line.  Defendants also have incentivized senior staff to maximize markups and add-ons by tying their compensation to dealership profits.

28.     For the many customers who need financing to purchase a motor vehicle, Defendants have arranged for them to receive auto loans through third-party financing companies.  In such situations, Defendants have reviewed customers' credit applications, obtained customers' credit reports, and verified customers' income to make an initial determination about whether customers will meet various financing companies' underwriting guidelines.  Defendants have then submitted applications to one or more of those companies on behalf of customers.

29.     Each financing company has provided Defendants with a specific "buy rate," a risk-based finance charge that reflects the interest rate at which the entity will finance a retail installment contract from the dealer to the applicant for the purchase of a vehicle.  In some

circumstances, depending on its policies, the financing company has also permitted Defendants to add a finance charge on top of the buy rate—that additional charge is called a "markup." Unlike the buy rate, the markup is not based on the underwriting risk or credit characteristics of the applicant, but instead is pure profit to Defendants.

30.     Defendants generally have communicated to the consumer only the final total contract rate, which equals the buy rate plus the markup.  The financing company has compensated Defendants from the increased interest revenue derived from the markup.

31.     For example, in October 2019, one of Defendants' American Indian customers qualified for an interest rate of about 4.65% on a 66-month loan of nearly $19,000, but Defendants marked up the interest rate 200 basis points, to 6.65%.  The customer was forced to pay more than $1,150 in additional interest over the course of the contract because of Defendants' markup.  Meanwhile, the financing company allowed Defendants to retain about $800 of that $1,150 as a reward for making the customer's loan more expensive through the markup.

32.     In connection with the sale of a motor vehicle, auto dealerships commonly charge consumers for one or more add-on products.  Here, Defendants often have charged customers for one or more add-on products, such as vehicle service contracts,[2] Guaranteed Asset Protection ("GAP") insurance,[3] prepaid maintenance, tire and wheel protection, key replacement, nitrogen tire fills, or theft recovery.  The charges to Defendants' customers for add-on products have ranged from several hundred to a few thousand dollars.  As a result, add-ons have substantially

---

[2] A vehicle service contract covers the cost of certain repairs or services over a specified time period and may also be known as an extended warranty.
[3] GAP insurance covers the difference (or "gap") between the amount the consumer owns on the auto loan and the amount received from the vehicle insurer in the event of a total loss.

increased the cost of purchasing and financing a vehicle and also have substantially increased Defendants' profits on the sale.

*Unfair and Deceptive Add-on Practices*

33.     For years, Defendants have charged consumers for add-on products in connection with a vehicle purchase without obtaining consumers' express, informed consent.  This pattern of "packing" add-on products onto vehicle purchases has continued from at least 2016 to the present.  Charges for add-on products typically have been added to the total amount financed and spread over years of installment payments, making it more difficult for consumers to detect the overall cost of add-on charges when looking at their monthly loan payments.

34.     Add-on products and services have been a major source of profit for Rhinelander Auto Dealerships because these products and services have been sold far above cost and have increased the total amount financed, leading to higher principal and interest payments on auto contracts.

35.     Overall, since 2016, over half of Rhinelander Auto Dealerships' customers who purchased their vehicle on financing arranged by Defendants have been charged for add-ons, including chiefly vehicle service contracts and GAP insurance.  But many Rhinelander customers who have paid add-on charges have been tricked into doing so.  In fact, 53% of surveyed customers who recalled their vehicle purchase reported that they did not know about or agree to buy one or more add-ons for which they were charged, or were falsely told that they needed to buy at least one add-on that was actually optional.

36.     In numerous instances since 2016, Defendants have bundled add-on products with customers' vehicle purchase price without customers' knowledge.  Indeed, 37% of surveyed customers who recalled their vehicle purchase reported that they did not agree to at least one

add-on for which they were charged.  Defendants' decision to impose these add-on charges without obtaining their customers' express, informed consent has unfairly increased the overall purchase price by thousands of dollars.

37.     Additionally, even when Defendants have not been packing add-ons into customers' contracts, Defendants nevertheless have been misleading many customers into purchasing them as required or "essential" for the purchase:  About 15% of surveyed customers were falsely told by Defendants' staff that at least one add-on product or service was required to purchase the vehicle, obtain financing, or lock in an interest rate.  In reality, Defendants' customers have not ever been required to buy add-ons in order to purchase or finance a vehicle or lock in a particular price or interest rate.  As a result, many customers have spent hundreds or thousands of dollars on add-ons that they thought were required based on Defendants' misrepresentations.

38.     For example, when one customer obtained a loan in December 2019 to buy a new car, the Rhinelander Auto Dealerships' finance department told her that GAP insurance was required because she had a co-signer on her loan.  Contrary to that misrepresentation, GAP insurance was an optional add-on product and was not required.  The customer did not want to purchase any additional products but wound up spending $895 for GAP insurance plus interest payments attributable to the added expense.  Specifically, because her APR was marked up to 6.29% over a 75-month term—earning Rhinelander Auto Dealerships nearly $1,300 as a reward for the markup—the customer paid almost $1,100 attributable to the unwanted GAP insurance.

39.     Add-on charges may amount to hundreds or thousands of dollars, but Defendants often have made these charges difficult for customers to identify, understand, and contest.  In multiple instances, Defendants have failed to provide customers with a copy of their contracts,

have provided misleading explanations of add-on products and services, or have pressured them to buy add-ons, preventing customers from understanding what exactly they are purchasing.

40.     For example, one surveyed customer recalled that Defendants did not explain what the add-ons were for.  Instead of accurately explaining the add-ons, Defendants led the customer to believe she was required to purchase a $2,500 vehicle service contract, which cost nearly 15% of the vehicle's purchase price.  Moreover, the customer financed the purchase with a 72-month loan at an interest rate of over 16%—marked up 400 basis points over the buy rate—meaning she would pay more than $1,400 in extra interest payments to buy the service contract.  Overall, Defendants' misrepresentation that the vehicle service contract was required led the customer to bear nearly $4,000 in unwanted costs.

41.     Even when customers have had an opportunity to review all of the paperwork associated with the transaction, the unauthorized add-on charges have been difficult to identify and dispute because they have been buried in dense contracts, not clearly explained, packaged together, misleadingly labeled, or rolled into the financed price.  On top of that, consumers may have felt rushed or pressured by Defendants' employees to complete the deal after sometimes having spent hours at the dealership before receiving the final paperwork.  This is especially true because Defendants have encouraged consumers to pursue same-day financing arrangements.

42.     When Defendants cannot immediately finalize the purchase—for example, when a financing company is already closed for the day—Defendants in some instances have not given consumers copies of the contracts to take home while the financing application is pending.

43.     The add-on products—chiefly GAP insurance and vehicle service contracts—that Defendants have inserted in purchase contracts without obtaining customers' express, informed consent cost anywhere from several hundred to several thousand dollars.  In many instances, the

13

price of the add-ons for which Defendants have charged customers without their authorization has comprised a significant portion of the overall amount the customer is financing.

***Defendants' Discriminatory Credit Practices***

44.     Defendants have engaged in a policy or practice of unlawful discrimination on the basis of race, color, and national origin by imposing higher borrowing costs on American Indian customers relative to non-Latino White customers in financed motor vehicle purchase transactions, including by charging them higher interest rates on purchases financed by companies that allow discretionary markups and charging them for more unwanted add-on products.  This unlawful discrimination has continued from at least 2016 to the present.

45.     Defendants have maintained a policy of permitting their employees, at their discretion, to increase the cost of the financed vehicle purchase transaction for customers by, among other things, marking up the initial interest rate quoted by the financing company up to the maximum permissible markup allowed by that company.  Defendants have had full discretion to decide whether (and how much) to increase the interest rate within the range allowed by the financing company, and have presented customers only with the final annual percentage rate offered after the markup has already been added.  Defendants have encouraged their employees to maximize markups wherever possible in order to increase the Rhinelander Auto Dealerships' profitability.  Defendants also have tied some senior employees' compensation to the Rhinelander Auto Dealerships' monthly profits, which gives those employees a strong incentive to wring extra profit from customers by tolerating unfair, deceptive, or discriminatory practices in the sales process.  This policy of allowing discretionary markups to maximize profit has continued from at least 2016 to the present.

14

46.     Defendants on average have marked up the interest rate on American Indian consumers' auto loans higher than they have marked up non-Latino White customers' loans.  On average, among the thousands of customers since 2016 who have received motor vehicle financing through Defendants from financing companies that allow markups, American Indian customers have been charged approximately 34 basis points (approximately $401 per customer) more in interest-rate markups than similarly situated non-Latino White customers.  That disparity has increased since the ownership transfer, with American Indian customers being charged on average approximately 50 basis points more in interest-rate markups than similarly situated non-Latino White customers since March 2019.  As a result, American Indian customers collectively have paid tens of thousands of dollars more in financing costs.

47.     American Indian customers at the Rhinelander Auto Dealerships who have received financing from companies that allow markups also have received larger markups much more frequently than non-Latino White customers.  Indeed American Indian customers who received financing from a company that allows markups received an average markup of over 100 basis points relative to the buy rate that the financing company approved.  A large markup can add hundreds if not thousands of dollars to the interest payments a customer must bear.

48.     With respect to add-on products sold in financed transactions, Defendants have charged American Indian customers for unwanted add-ons with more frequency than they have charged non-Latino White customers.  As a result, American Indian customers with financed auto purchases from Rhinelander Auto Dealerships have paid more add-on charges than similarly situated non-Latino White customers, as well as additional interest thereon.  Specifically, Defendants' discriminatory policy or practice of imposing greater add-on charges on American Indian customers has resulted in American Indian customers paying approximately $1,362 more

for add-ons in credit transactions than similarly situated non-Latino White customers since 2016, and $1,374 more since Current Owners took over the Rhinelander Auto Dealerships in March 2019.

49.     The disparity in finance and add-on charges between American Indian and non-Latino White consumers at the Rhinelander Auto Dealerships has been substantial and statistically significant.

50.     Defendants' addition of unwanted financing costs and add-on products to American Indian customers' financed transaction has substantially increased the total amount in principal and interest that the customers have paid over the course of financing by hundreds or thousands of dollars.

51.     American Indian customers cannot reasonably avoid the additional costs because they do not know they have been charged more than similarly situated non-Latino White customers for markups or that they have been charged more often for unauthorized add-on products.  They would not be able to discover the discriminatory conduct without examining Defendants' continuous conduct over a lengthy period.  These customers also often live in rural areas with relatively few car dealerships to choose from.  There are no countervailing benefits to consumers or competition in charging American Indian customers higher interest rates and for more unauthorized add-ons as compared to similarly situated non-Latino White customers.

52.     Defendants have engaged in the discriminatory practices identified above despite repeatedly representing to auto finance companies that they would comply with fair lending laws, including the ECOA and Regulation B.  Additionally, since 2017, multiple auto finance companies have regularly provided general notices to Defendants about Defendants' obligations under fair lending laws, in addition to including a provision about those obligations in their

contracts with Defendants.  Those general notices have advised Defendants that fair lending laws prohibit intentional discrimination as well as neutral practices with an adverse impact on protected classes, and that fair lending laws cover every aspect of a credit transaction.

53.     Defendants' discretionary policies regarding markups and add-ons have not been justified by a business necessity that could not be met by a less discriminatory alternative. Instead, Defendants' policies have allowed Defendants to wring more profit from American Indian customers purchasing vehicles on credit by imposing greater unwanted costs.

54.     Defendants have engaged in their policy or practice of discrimination against American Indian customers in vehicle financing transactions under Towne's continuous leadership at the Rhinelander Auto Dealerships since 2016.

### *Defendant Daniel Towne's Responsibility for the Misconduct*

55.     As general manager of the Rhinelander Auto Dealerships since approximately 2016 and currently as a partial owner, Defendant Towne has overseen the Dealerships' policies and practices about sales and financing, and has been in charge of enforcing compliance with such policies.  He typically has been present at the Dealerships on a daily basis and has closely monitored both the sale and financing of vehicles at all three locations.  He currently holds himself out to the public as the Owner and Executive Manager of the Dealerships.

56.     Defendant Towne has known that American Indian customers typically receive higher interest rate markups than non-Latino White customers.  He also has known that American Indian customers typically are charged without their knowledge or consent for add-on products with more frequency than other customers.

57.     On numerous occasions, both individually and at routine meetings involving upper management, staff at Rhinelander Auto Dealerships has raised concerns to Defendant

Towne about the discriminatory practices involving higher interest rate markups and more frequent unauthorized add-on charges for American Indian consumers. Despite this notice, Defendant Towne has not taken steps to address or change his or the Rhinelander Auto Dealerships' practices. Rather, in many instances, Defendant Towne has encouraged and instructed staff to structure sales and financing to maximize profits obtained from American Indian consumers.

58.     Based on the facts and violations of law alleged in this Complaint, Plaintiffs have reason to believe that Defendants are violating or are about to violate laws enforced by the Commission and the State of Wisconsin because, among other things, Defendants' unbroken policy or practice of deceptive, unfair, and discriminatory conduct has continued from 2016 to the present under Defendant Towne's leadership.

## VIOLATIONS OF THE FTC ACT

59.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

60.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

61.     Acts and practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n).

<u>**Count I**</u>
**Misrepresentations Regarding Add-On Products**
**(By Plaintiff FTC Against All Defendants)**

62.     In numerous instances, in connection with the advertising, marketing, promoting, offering for sale or financing, or sale and financing of vehicles, Defendants have represented, directly or indirectly, expressly or by implication, that, in order to purchase, lease, or finance a vehicle, consumers are required to purchase add-on products.

63.     In truth and in fact, in numerous instances in which Defendants have made the representation set forth in Paragraph 62, consumers have not been required to purchase add-on products in order to purchase, lease, or finance a vehicle.

64.     Therefore, Defendants' representation set forth in Paragraph 62 is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

<u>**Count II**</u>
**Unfair Practices Regarding Charges for Add-On Products**
**(By Plaintiff FTC Against All Defendants)**

65.     In numerous instances, Defendants have charged consumers for add-on products without obtaining consumers' express, informed consent.

66.     Defendants' actions, as set forth in Paragraph 65, have caused or are likely to cause substantial injury to consumers that consumers could not or cannot reasonably avoid themselves and that has not been outweighed by countervailing benefits to consumers or competition.

67.     Therefore, Defendants' acts or practices as set forth in Paragraph 65 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**Count III**
**Unfair Practices Regarding Discriminatory Costs**
**(By Plaintiff FTC Against All Defendants)**

68.     In numerous instances, Defendants have imposed higher costs on American

Indian consumers than on similarly situated non-Latino White consumers.

69.     Defendants' actions, as set forth in Paragraph 68, have caused or are likely to

cause substantial injury to consumers that consumers could not or cannot reasonably avoid

themselves and that has not been outweighed by countervailing benefits to consumers or

competition.

70.     Therefore, Defendants' acts or practices as set forth in Paragraph 68 constitute

unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT & REGULATION B**

71.     Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of

Regulation B, 12 C.F.R. § 202.4(a), prohibit a creditor from discriminating against an applicant

with respect to any aspect of a credit transaction on the basis of race, color, religion, national

origin, sex, marital status, or age (provided the applicant has the capacity to contract); because all

or part of the applicant's income derives from any public assistance program; or because the

applicant has in good faith exercised any right under the Consumer Credit Protection Act,

15 U.S.C. ch. 41.

72.     Defendants are creditors as defined in Section 702(e) of the ECOA, 15 U.S.C.

§ 1691a(e), and Section 202.2(*l*) of Regulation B, 12 C.F.R. § 202.2(*l*).

73.     Section 704(c) of the ECOA, 15 U.S.C. § 1691c(c), specifically empowers the

Commission to enforce the ECOA.  Defendants' violations of the ECOA are deemed to be

violations of the FTC Act and are enforceable as such by the Commission.  Further, the

Commission is authorized to use all of its functions and powers under the FTC Act to enforce compliance with the ECOA by any person, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests set by the FTC Act.  This includes the power to enforce a regulation promulgated under the ECOA, such as Regulation B, in the same manner as if a violation of that regulation had been a violation of an FTC trade regulation rule.

**Count IV**
**Discriminatory Financing Practices**
**(By Plaintiff FTC Against All Defendants)**

74.     In connection with motor vehicle credit transactions, on the basis of race, color, and national origin, Defendants have imposed higher costs on American Indian applicants on average than similarly situated non-Latino White applicants.

75.     Defendants' acts, policies, or practices, as set forth in Paragraph 74, constitute discrimination against applicants with respect to any aspect of a credit transaction on the basis of race, color, and national origin, in violation of Section 701(a)(1) of the ECOA, 15 U.S.C. § 1691(a)(1), and Section 202.4(a) of Regulation B, 12 C.F.R. § 202.4(a).

## VIOLATIONS OF THE WISCONSIN DECEPTIVE TRADE PRACTCES ACT

76.     Wisconsin Stat. § 100.18(1), which is often referred to as the Wisconsin Deceptive Trade Practices Act, provides, in relevant part, that "no person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of . . . anything . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in this state, . . . an advertisement, announcement, statement or representation of any kind . . . which . . . contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

77.     The Wisconsin Attorney General and Wisconsin Department of Justice are authorized to bring civil actions in the name of the State of Wisconsin to enforce and enjoin violations of Wis. Stat. § 100.18, and to seek temporary and permanent injunctive relief, civil forfeitures, restitution for consumer pecuniary losses, and other relief, such as recovery of the State's costs.  *See* Wis. Stat. §§ 100.18(11)(d), 100.20(6), 100.26(4), 100.263.

## Count V
**(By Plaintiff State of Wisconsin Against Defendants Rhinelander Auto Group LLC, Rhinelander Import Group LLC, and Daniel Towne)**

78.     Defendants have made untrue, deceptive, and/or misleading representations to the public with intent to sell automobiles, including that in order to purchase, lease, or finance a vehicle, consumers are required to purchase add-on products.

79.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 78, consumers are not required to purchase add-on products in order to purchase, lease, or finance a vehicle.

80.     Therefore, Defendants' acts or practices as set forth in Paragraphs 78–79 are false or misleading and constitute violations of Wis. Stat. § 100.18(1).

## Count VI
**(By Plaintiff State of Wisconsin Against Defendants Rhinelander Auto Group LLC, Rhinelander Import Group LLC, and Daniel Towne)**

81.     In numerous instances, Defendants have made representations to finance companies, and others, indicating that they have obtained consumers' express, informed consent for the purchase of every add-on product purchased by Defendants' customers.

82.     However, in many instances, Defendants have sold add-on products to consumers without having obtained said customer's express, informed consent.

83.     Therefore, Defendants' acts or practices as set forth in Paragraphs 81–82 constitute violations of Wis. Stat. § 100.18(1).

## VIOLATIONS OF THE WISCONSIN CONSUMER ACT AND DFI-WCA 1.85

84.     The Wisconsin Consumer Act, Wis. Stat. §§ 421.101–427.105, has as its purposes, *inter alia*, to protect customers against unfair, deceptive, false, misleading and unconscionable practices by merchants, and to coordinate the regulation of consumer credit transactions with the policies of the federal Consumer Credit Protection Act.  Wis. Stat. § 421.102(2).

85.     Defendants are "merchants" as defined in Wis. Stat. § 421.301(25).

86.     Defendants' sales of automobiles and extension of credit to customers in connection with those sales are "consumer credit transactions" as defined in Wis. Stat. § 421.301(10).

87.     Wis. Stat. § 426.108 provides that "the administrator [of the Division of Banking] shall promulgate rules declaring specific conduct in consumer credit transactions and the collection of debts arising from consumer credit transactions to be unconscionable and prohibiting the use of those unconscionable acts."

88.     Pursuant to the directive set forth in Wis. Stat. § 426.108, the Administrator of the Division of Banking promulgated Wis. Admin. Code § DFI-WCA 1.85, which provides, *inter alia*, that "[d]iscrimination in the extension of consumer credit by a merchant to a customer on a prohibited basis shall be an unconscionable credit practice prohibited pursuant to s. 426.108, Stats."  The rule further provides that "prohibited basis" means, *inter alia*, race, national origin, and ancestry.

89.     Wis. Stat. § 426.109 authorizes the administrator of the division of banking to bring a civil action to restrain by temporary or permanent injunction a person from violating any provision of the Wisconsin Consumer Act or the administrative rules promulgated thereunder. Wis. Stat. § 426.301 further provides that the administrator may recover a civil forfeiture of not less than $100 nor more than $1,000 for each violation of the WCA or the administrative rules promulgated thereunder.  Violations that are knowing or willful are subject to a heightened penalty of no less than $1,000 nor more than $10,000 per violation.

### Count VII
### (By Plaintiff State of Wisconsin Against All Defendants)

90.     In connection with consumer credit transactions, on the basis of race, color, and national origin, Defendants have imposed higher costs on American Indian applicants on average than similarly situated non-Latino White applicants.

91.     Defendants' acts, policies, or practices, as set forth in Paragraph 90, constitute discrimination against applicants with respect to consumer credit transactions on a prohibited basis, in violation of Wis. Admin. Code § DFI-WCA 1.85 and Wis. Stat. § 426.108.  Defendants' acts, policies, or practices are knowing or willful.

### CONSUMER INJURY

92.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the ECOA, Regulation B, Wis. Stat. §§ 100.18 and 426.108, and Wis. Admin. Code § DFI-WCA 1.85.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

### PRAYER FOR RELIEF

93.     Wherefore, Plaintiffs request that the Court:

a.  Enter a permanent injunction to prevent future violations of the FTC Act,

the ECOA, Regulation B, Wis. Stat. §§ 100.18 and 426.108, and Wis. Admin.

Code § DFI-WCA 1.85 by Defendants;

b.  Award Plaintiff State of Wisconsin civil forfeitures for violations of Wis.

Stat. §§ 100.18 and 426.108 and Wis. Admin. Code § DFI-WCA 1.85;

c.  Award monetary and other relief within the Court's power to grant,

including relief under Section 19 of the FTC Act, 15 U.S.C. § 57b(b), and

Wis. Stat. § 100.18(11)(d); and

d.  Award any additional relief as the Court determines to be just and proper.

Dated: October 24, 2023                    Respectfully submitted,

/s/ Nathan H. Nash
Nathan Nash
Rachel Sifuentes
Rachel Granetz
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
nnash@ftc.gov
rsifuentes@ftc.gov
rgranetz@ftc.gov
(312) 960-5264 (Nash)
(312) 960-5617 (Sifuentes)
(312) 960-5620 (Granetz)
(312) 960-5600 (*fax*)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

JOSHUA L. KAUL
Attorney General, State of Wisconsin

/s/ Lewis W. Beilin
Lewis W. Beilin (WI #1038835)
Colin R. Stroud (WI #1119457)

25

Assistant Attorneys General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
beilinlw@doj.state.wi.us
stroudcr@doj.state.wi.us
(608) 266-3076 (Beilin)
(608) 261-9224 (Stroud)
(608) 294-2907 (*fax*)

Attorney for Plaintiff
STATE OF WISCONSIN